IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION


| | | |
|---|---|---|
| J.S., a minor student, by<br>T.S. and R.S., the<br>student's parents, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 2:22cv284-MHT |
| | ) | (WO) |
| AUTAUGA COUNTY BOARD OF<br>EDUCATION, | ) ) | |
| | ) | |
| Defendant. | ) | |


| | | |
|---|---|---|
| AUTAUGA COUNTY BOARD OF<br>EDUCATION, | ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 2:22cv306-MHT |
| | ) | (WO) |
| R.S. and T.S., as parents<br>and next friend of J.S., | ) ) | |
| | ) | |
| Defendants. | ) | |


OPINION AND ORDER

In these consolidated cases brought pursuant to the
Individuals with Disabilities in Education Act (IDEA),
20 U.S.C. § 1415(i)(2), the parties challenge the

decision of a state hearing officer regarding the provision of special-education services to J.S., a kindergarten student. This court has jurisdiction over these cases pursuant to 28 U.S.C. § 1331 (federal question) and 20 U.S.C. § 1415(i)(2)(A) (IDEA). In the lead case, plaintiffs T.S. and R.S, both parents of J.S., appeal the hearing officer's refusal to order defendant Autauga County Board of Education to reimburse them for private-school tuition for their child. In the member case, plaintiff Autauga County Board of Education appeals the hearing officer's findings both that it violated J.S.'s and defendants T.S. and R.S.'s rights to a free appropriate public education under the IDEA and that it must provide certain relief.

Now before the court is the parents' appeal only. The court held an oral argument on the parents' appeal on January 31, 2023. For the reasons discussed below, the court upholds the decision of the hearing officer

2

to the extent that he found that reimbursement for
private-school tuition is not required, though the
court reaches such decision on different grounds.


## I.   LEGAL BACKGROUND

The IDEA was enacted "to ensure that all children
with disabilities have available to them a free
appropriate public education that emphasizes special
education and related services designed to meet their
unique needs." *Walker Cnty. Sch. Dist. v. Bennett*, 203
F.3d 1293, 1294 (11th Cir. 2000) (citing 20 U.S.C.
§ 1400(d)(1)(A)).   Pursuant to the statute, state and
local educational agencies receive federal funds; in
exchange, these agencies "are required ... to identify
children with disabilities and to develop for each
disabled child an annual individualized education
program or IEP." *Id*. (footnotes omitted).

The IDEA requires state and local educational
agencies receiving federal funds to set up procedures

"to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a free appropriate public education by such agencies." 20 U.S.C. § 1415(a). Parents and local educational agencies must be allowed to file complaints "with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such children," *id.* § 1415(b)(6)(A), and to have an impartial "due process hearing" on such complaints by a hearing officer, *id.* § 1415(f). That hearing officer must determine "whether the child received a free appropriate public education." *Id.* § 1415(f)(3)(E).

If a party disagrees with the findings and decision of the hearing officer, the party may file a civil action regarding the complaint. *Id.* § 1415(i)(2)(A). The court hearing the case "shall receive the records of the administrative proceedings; ... hear additional

evidence at the request of a party; and ... basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." *Id.* § 1415(i)(2)(C).

In reviewing a hearing officer's decision under 20 U.S.C. § 1415(i)(2), the district court must give the findings of the hearing officer "due weight." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206 (1982). "To that end, administrative fact[-]findings 'are considered to be prima facie correct, and if a reviewing court fails to adhere to them, it is obliged to explain why.'" *Loren F. ex rel. Fisher v. Atlanta Indep. Sch. Sys.*, 349 F.3d 1309, 1314 n.5 (11th Cir. 2003) (citations omitted). However, "[t]he extent of deference to be given the administrative findings of fact is an issue left to the discretion of the district court." *Jefferson Cnty. Bd.*

*of Educ. v. Breen*, 853 F.2d 853, 857 (11th Cir. 1988).[1]
The hearing officer's legal conclusions are to be
reviewed *de novo*. *Myles S. ex rel. SS v. Montgomery
Cnty. Bd. of Educ.*, 824 F. Supp. 1549, 1553 (M.D. Ala.
1993) (Thompson, J.).  In determining whether the IDEA
has been violated, "courts must be careful to avoid

---

1. As Judge Steele has pointed out, the case law
setting forth the standard of review is somewhat
inconsistent.  *See Escambia Cnty. Bd. of Educ. v.
Benton*, 406 F. Supp. 2d 1248, 1257 n.8 (S.D. Ala. 2005)
(Steele, J.).  "[T]he Eleventh Circuit has stated that
'the district court conducts an *entirely* de novo review
of the ... [hearing officer]'s findings' in IDEA cases.
Such a pronouncement may not be irreconcilable with
principles of deference to educational expertise,
granting 'due weight' to the administrative decision,
and non-substitution of judgment for that of the
hearing officer, but it certainly does underscore the
tension and ambiguities permeating the appellate
guidance on this point."  *Id*. (citing *Sch. Bd. of
Collier Cnty., Fla. v. K.C.*, 285 F.3d 977, 983 (11th
Cir. 2002)).

In any case, the result here is the same regardless
of whether the court applies a deferential or de novo
standard of review to the hearing officer's factual
findings.  As discussed below, the court disagrees with
the hearing officer's legal conclusions, not his
factual findings.

imposing their view of preferable educational methods upon the States." *Rowley*, 458 U.S. at 207.

## II.  FACTUAL BACKGROUND

In August 2021, five-year-old J.S. enrolled in kindergarten at Pine Level Elementary School in the Autauga County, Alabama Public Schools.  Tr. (Doc. 21-1) at 262.[2]  From the start, he exhibited behavioral issues.  He could not sit still in class, ran around the classroom and the hall in circles, and failed to follow directions.  *Id.* at 262, 265-267.  In response to these behaviors, the principal quickly implemented strategies to address his behavior and referred him for a special-education evaluation.  *Id.* at 269-271. J.S.'s parents agreed to the evaluation.

The child's behavior varied from day to day.  He had some good days but had many others marred by

_____

2.  The court's citations to the administrative record refer to the court system's ECF page numbers, not the parties' Bates numbers.

7

behavioral difficulties. *See* Behavior Charts (Doc. 21-5) at 107-108. J.S., who strongly identified with a cartoon/videogame character named Sonic the Hedgehog, frequently referred to himself as Sonic, "would constantly run in circles and spin" like Sonic, and would "[s]ometimes say he was being a tornado" and, in doing so, knock things over. Tr. (Doc. 21-1) at 273-74. He began kicking, spitting, punching, yelling "I hate you" at adults, and cursing when upset. Behavior Documentation (Doc. 21-5) at 147-63 and (Doc. 21-6) at 2-30. As time went on, he began threatening staff using sometimes-graphic language. *See* Freeman Email (Doc. 21-6) at 32.

The special-education evaluation found that J.S. had a sensitivity to loud noise as well as severe deficits in a number of areas, including behavior, attention, motor skills, communication, interpreting social cues, and interacting appropriately with peers and adults. Occupational-Therapy Evaluation (21-3) at

8

39-40; Notice and Eligibility Decision (Doc. 21-5) at 117-121 (summarizing findings).  J.S.'s mother had him further evaluated by his pediatrician, who diagnosed him with Attention-Deficit Hyperactivity Disorder (ADHD), which she communicated to the school district's special-education evaluator.  Notice and Eligibility Decision (Doc. 21-5) at 120.  J.S. was found eligible for special education in the category of Other Health Impairment.  Eligibility Decision (Doc. 21-5) at 123-24.

On October 6, a group of school-district employees, J.S.'s mother, and a behavior analyst convened to develop an initial IEP for J.S.  *See* October 6, 2021 IEP (Doc. 21-5) at 144-45.  The team agreed that the behavior analyst would complete a functional behavioral assessment and that a behavior plan would be developed using the findings from the assessment.  *Id.* at 138.[3]

_____

3.   The behavior analyst conducted three observations of J.S. between October 6 and 15 but did not complete the assessment.

The IEP also called for 30 minutes of group behavior classes four days per week, 30 minutes of occupational therapy once per week, and 30 minutes of speech therapy once per week, all of which would be provided by pulling J.S. out of his kindergarten classroom. *Id*. at 142. The child would also get no more than three breaks of 15 minutes per day in a sensory room to calm down, as well as assistance from adults with transitions and safety. *Id*.

As October went on, and his behavior problems continued, school staff filed multiple reports about J.S.'s behavior with child-welfare authorities, referred him to the local mental-health authority, and made safety plans. *See* Reports of Suspected Child Abuse/Neglect (Doc. 21-2) at 242 and (Doc. 21-3) at 3, 21; Greene Email (Doc. 21-2) at 244; Safety Plan (Doc. 21-2) at 250-252. His parents took their child to a psychiatrist but had concerns about the doctor's approach; they attempted to get J.S. an appointment at

10

the University of Alabama at Birmingham medical center for a more thorough psychiatric evaluation but faced a wait of four to five months.  Tr. (Doc. 21-1) at 701-703.  On October 20, the principal reached out to the district's special-education director and shared her belief that Pine Level Elementary School might not be J.S.'s least-restrictive environment.  Harry Email (Doc. 21-3) at 8-9.

On November 4, after being disruptive in class, J.S. ran out of the classroom and up and down the halls.  *Id*. at 24.  The principal and assistant principal grabbed him in an attempt to restrain and carry him into a classroom.  While they were attempting to restrain him, he grabbed the principal's neck with both hands.  *Id.*  When she yelled at him to let go, he did so.  Suspension Notice (Doc. 21-3) at 26.  In response to this incident, the principal suspended J.S. for two days, made a police report, documented the

11

incident, and again referred the family to child-welfare authorities.

An IEP meeting was held five days later. IEP Meeting Agenda (Doc. 21-2) at 162. At the IEP meeting, school staff discussed the efforts they had made to accommodate J.S. in the elementary school and had a teacher explain the benefits of a behavior unit located at the Second Chance Alternative School.[4] J.S.'s father told the group that this was a very important decision about his child's future and that he needed to go home to talk it over with his wife and think it over. *See* Nov. 9 IEP Meeting Notes (Doc. 21-2) at 168. After the parents left the meeting, the school staff went ahead and changed J.S.'s least-restrictive environment to the behavior unit at the alternative school, effective

---

4.   The Second Chance Alternative School is a small building that provides long-term disciplinary placements for students in grades three through 12 charged with major infractions of the code of conduct. The school is surrounded by an eight-to-ten-foot fence topped with barbed wire and lacks a playground, a gym, and a cafeteria. Students are screened for weapons and must empty their pockets when they enter the building.

immediately.  *See* Notice of Proposal or Refusal to Take Action (Doc. 21-6) at 87; Nov. 9, 2021 IEP (Doc. 21-6) at 78-86.

J.S.'s parents, through counsel, submitted a request for a due-process hearing on November 19, which was received by the State Board of Education on November 23.  *See* Request for Due Process Hearing (Doc. 21-2) at 3.  At the end of November, J.S.'s mother twice attempted to bring him back to Pine Level Elementary School to attend school but was rebuffed by school staff, even after stating that she was invoking her "stay put" rights.[5]  Tr. (Doc. 21-1) at 679-681.

On December 6, the parties participated in a due-process resolution meeting, which was unsuccessful. Email from Hearing Officer (Doc. 21-2) at 11.  At that meeting, the parents requested an independent

_____

5.  The part of the IDEA commonly known as the "stay put" provision, 20 U.S.C. § 1415(j), generally allows students to stay in their educational placements while their parents challenge a proposed change in placement through the IDEA's provisions.

13

educational evaluation of J.S. for autism spectrum disorder at the district's expense, to which the district agreed. Later that day, the hearing officer convened a conference call with the parties' attorneys to discuss whether J.S. was entitled to return to Pine Level Elementary based on the IDEA's "stay put" provision. Email from Hearing Officer (Doc. 21-2) at 11. The hearing officer ruled that J.S. was entitled to return to Pine Level Elementary School and that the school would remain his placement until the hearing officer issued a decision after the due-process hearing. *Id*.

J.S.'s parents decided not to take him back to Pine Level and instead enrolled him at Success Unlimited Academy, a private school. On December 17, 2021, they notified the district, through counsel, of their intent to place J.S. in private school at Success Unlimited Academy and demanded reimbursement of the cost of his attendance there. Sexton Email (Doc. 21-5) at 54.

**14**

Success Unlimited Academy was started by a former special-education teacher with many years of experience in the field. Tr. (Doc. 26-1) at 5-6. Around half of its employees and several administrators have a special-education background. *Id.* at 6-7. The school educates approximately 50 students in kindergarten through sixth grade and approximately 280 students in total. *Id.* at 6, 41. About 53 percent of the students have disabilities. *Id.* at 41.

J.S. began attending Success Unlimited after winter break, in early January 2022. The school schedule for kindergartners was four days per week for four hours per day. Tr. (Doc. 26-1) at 61. J.S. was placed in a classroom with one teacher for 11 students, of whom he was the only child with a disability. *Id.* at 56. At the request of the school, one of J.S.'s parents sat outside the classroom in the hall, in case they were needed to assist with his behavior; when he misbehaved, the parent came into the classroom with him. *Id.* at

15

52, 53-54.  He attended for about two days before being required to be out for a week or two because a family member had been infected with COVID-19, but then returned to the school.  *Id.* at 15.

At Success Unlimited, J.S. continued to have behavioral issues, but they were less severe than those at Pine Level Elementary.  *Id.* at 22.  He did not swear, did not threaten anyone, and did not use graphic language.  *Id.* at 22, 35-36.  However, he continued to have trouble sitting down and focusing on his work, knocked books off the shelf, tried to run out of the classroom, and kicked his legs; though he did not actually kick any children or staff, probably because his parents handled him.  *Id.* at 16-17, 55.  He also continued to say, "I hate you," *id.*, and on at least one occasion said, "I'll fight you," *id.* at 46.  Due to behavior issues, the head of school testified that J.S. probably never spent more than two hours per day in the

16

classroom before going home--two and half hours at the
most. *Id.* at 61.

In mid-February 2022, in response to his
distracting behavior in the classroom, the head of
school reduced J.S.'s education plan from four
four-hour days of school per week to two hours per week
of one-on-one tutoring. *Id.* at 9, 43. The tutoring
was provided by a teacher at the high-school campus and
was to cover both behavioral and academic subjects; by
the time of the due-process hearing in early March,
these sessions had mostly focused on behavior. *Id.* at
19-20. J.S. also received packets of schoolwork to do
at home. *Id.* at 20. His mother reported difficulty
with getting him to complete assignments at home. T.S.
Email (Doc. 21-6) at 128-29.

At the due-process hearing on March 3, 2022,
shortly after the switch to tutoring, the head of
school testified that her plan was to allow J.S. to
adjust to the demands of a classroom setting by

17

returning him to the classroom gradually after spring break, beginning on March 29. *Id.* at 9, 19-21, 47-48. After the break, she planned to have him come to the classroom two days per week, for increasing amounts of time, and to continue with the tutoring two days per week. *Id.* at 20-21, 47. She hoped to build up his ability to stay in the classroom over time. *Id.* at 47-48.

That same month, the independent educational evaluation requested by the parents concluded with a diagnosis of autism spectrum disorder, attention deficit hyperactivity disorder, and other disruptive behavioral disorder. Evaluation (Doc. 21-2) at 54.


### III. THE HEARING OFFICER'S DECISION

Later that month, the hearing officer decided that the district denied J.S. and his parents a free appropriate public education (FAPE) and granted the parents limited relief. *See* Due-Process Decision (Doc.

18

21-7) at 111-36.   The following summarizes the parts of the decision relevant to the parents' appeal.

The hearing officer found the district had violated J.S. and his parents' right to a FAPE by violating the requirement that the child be educated in the least-restrictive environment and through the cumulative effect of a combination of procedural violations.   *Id.* at 122-24.   He then turned to the issue of whether the parents should be reimbursed for the cost of J.S.'s private-school tuition.

In his decision, the hearing officer correctly noted that the parents of a child who qualifies for special education can be reimbursed for the cost of a private school when a school district fails to provide a FAPE and the private-school placement is appropriate under the IDEA--and he elaborated the factors that come into play in deciding whether to order reimbursement. *Id.* at 125.   He explained:

> "Once it is determined that a school district failed to provide a free appropriate public

education and private placement is suitable, various related factors such as notice to the district of the private placement, the district's opportunity to evaluate the child and most significantly in this case, the district's opportunity to provide services each must be examined to determine if reimbursement is warranted ... . Moreover, those factors and other equities may also be considered in awarding reimbursement or reducing the amount of the reimbursement."

Due-Process Decision (Doc. 21-7) at 125 (citing *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 247 (2009), and *Sch. Comm. of Town of Burlington v. Dep't of Educ.*, 471 U.S. 359, 370 (1985)).

The hearing officer concluded that the parents' placement of J.S. at the private school was appropriate for reasons that will be discussed below. However, based on equitable considerations, he decided that the parents were not entitled to tuition reimbursement. In so deciding, he pointed to the school district's willingness to take the child back into the school after being ordered to do so and the district's agreement to pay for the independent educational

20

evaluation requested by the parents at the December 6 resolution meeting. *Id*. He reasoned that the district was entitled to another chance to educate J.S. before having to reimburse the child's parents for private-school tuition. *Id*. at 126.

## IV. DISCUSSION

In their appeal, the parents challenge the hearing officer's decision to deny reimbursement for J.S.'s tuition at Success Unlimited Academy. They argue that, while the hearing officer correctly found the placement at Success Unlimited was appropriate, he erred in deciding that equitable considerations weighed against tuition reimbursement. For purposes of this opinion, the court assumes that the hearing officer's decision that the district denied J.S. a FAPE is correct.

When a court finds that a school district has denied a child a FAPE, the IDEA authorizes the court to "grant such relief as the court determines is

21

appropriate." 20 U.S.C. § 1415(e)(2). The "IDEA authorizes reimbursement for the cost of private special-education services when a school district fails to provide a FAPE and the private-school placement is appropriate." *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 247 (2009); *see* 20 U.S.C. § 1412(a)(10)(C)(ii). To be "appropriate," a private placement need not provide all of the services that would be required of a public school. *See Florence Cnty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 14 (1993) ("[R]eimbursement [for private-school tuition] is [not] necessarily barred by a private school's failure to meet state education standards."). "An alternative educational program chosen by parents who reject an inadequate program is appropriate so long as it is reasonably calculated to enable their child to receive educational benefits." *R.L. v. Miami-Dade Cnty. Sch. Bd.*, 757 F.3d 1173, 1183 (11th Cir. 2014) (citing

*Florence Cnty. Sch. Dist. Four,* 510 U.S. at 12-13; *Rowley*, 458 U.S. at 206-07).

Even where a placement is appropriate, the IDEA vests district courts with discretion to deny some or all reimbursement based on equitable considerations. *See* 20 U.S.C. § 1412(a)(10)(C)(iii). For example, courts may reduce or deny the cost of reimbursement if the parents failed to inform the IEP team in a timely manner of their rejection of the proposed placement and their intent to place the child in private school at public expense. *See* 20 U.S.C. § 1412(a)(10)(C)(iii)(I). A hearing officer or court may also deny reimbursement if it finds that the parents' actions were unreasonable. *See* 20 U.S.C. § 1412(a)(10)(C)(iii)(III).

The court first addresses the appropriateness of the placement. As noted above, the hearing officer found that Success Unlimited was an appropriate placement but that the equities weighed against

23

ordering the district to reimburse the parents for tuition. He found Success Unlimited to be "appropriate" for J.S. because the school has qualified staff with training in special education, has an "acceptable student to staff ratio[,] ... has taken steps to address ... [J.S.'s] distracted and noncompliant behavior by reducing the hours he will attend[, and] ... will provide tutoring as compensation for missed instruction." Due-Process Decision (Doc. 21-7) at 125. Notably, he added that "it would be speculative to say that the child will 'progress' at the school in the future[, and] ... [w]ere he not to progress, the placement might not remain appropriate or 'proper under the Act' for purposes of reimbursing its cost." *Id*.

The court agrees that Success Unlimited is staffed by qualified individuals, many of whom have backgrounds in special education. However, the court does not have sufficient evidence before it at this time to find that

**24**

Success Unlimited was in fact an appropriate placement for J.S.

The court understands that, from the parents' perspective, Success Unlimited had much to recommend it. The school has a staff and administration with significant experience in serving students with special needs. In spite of being informed about J.S.'s serious behavioral issues, the head of school felt that the school could work with him. J.S. was placed, at least at first, in a mainstream classroom with regular-education students. The class size of 11 students was far smaller, and probably much better for J.S., than were the more than 20 students in his kindergarten class at Pine Level Elementary School.

However, at the time he enrolled, Success Unlimited was not able to deal effectively with his behavior. Though J.S. started out in a regular kindergarten classroom, he stayed in class *at most* for two-and-a-half hours per day due to his behavior, even

with a parent there to help control him.  Tr. (Doc.
26-1) at 61.

Due to his distracting behavior, after only 19 days
of schooling, J.S. was switched from four days per week
of schooling to a total of *two hours per week* of
tutoring on behavior and academics, which had focused
almost solely on behavior at the time of the hearing.
He was also given packets of schoolwork to complete at
home with assistance from his parents, although his
mother had told the head of school that she was having
trouble getting him to complete assignments at home.
Given these difficulties, the court assigns little
educational value to the packets.

This arrangement was to last for at least a month.
After that, the head of school planned to start
bringing J.S. back to the classroom for increasing
amounts of time on two days a week so that he could
adjust to the behavioral requirements of a classroom
environment.  Whether this was likely to work--and how

26

much time J.S. was likely to end up spending in the classroom after the break--was not at all clear.  That is not to say that the court does not find the head of school credible; rather, the court finds her testimony as to what would happen after the break insufficiently concrete to find placement at Success Unlimited appropriate and to serve as a basis for ordering reimbursement.

Notably, the head of school testified that J.S. would ideally have been placed in the school's classroom for children with serious behavioral issues, academic issues, and disabilities, in which five students are taught by two teachers--but the class was full for the school year.  Tr. (Doc. 26-1) at 56.  She testified that, if his behaviors did not improve by the beginning of the next school year, she would recommend that J.S. be placed in that classroom.  *Id*. at 56-57.  However, the record contains no evidence as to what occurred the following school year.

27

In addition, J.S.'s initial IEP determined that he needed both occupational therapy and speech therapy, which Success Unlimited does not provide. As mentioned earlier, a private school's inability to meet all of the legal requirements applicable to a public school does not necessarily render it inappropriate for reimbursement. *See Florence Cnty. Sch. Dist. Four*, 510 U.S. at 14; 34 C.F.R. § 300.148(c) ("A parental placement may be found to be appropriate by a hearing officer or a court even if it does not meet the State standards that apply to education provided by the SEA and LEAs."). Here, however, an occupational-therapy evaluation rated J.S.'s fine-motor skills in only the first percentile and found that he has "significant deficits in his age group's fine and visual-motor skills ... [that] can impact ... [his] ability to perform independent self-care, write, manipulate learning tools, and engage in the learning environment." Occupational-Therapy Evaluation (Doc.

28

21-3) at 39-40.  Given the severity of his motor-skills deficit and its potential impact on his ability to learn, the unavailability of occupational therapy at the school is a further non-dispositive factor weighing against a finding of appropriateness.

The parents suggest that Success Unlimited was an appropriate placement because J.S. made progress there. The court does not find this argument persuasive. While J.S. did not curse, threaten anyone, use graphic language, or kick or punch students or staff during this time at Success Unlimited, this was likely due to the presence of his parents to handle his misbehavior and take him home before his behavior could escalate to such an extent.  The testimony showed that J.S. engaged in kicking at others but that he did not actually kick another student because a parent was present to intervene.  And the court sees no evidence that J.S. made any academic progress during his time at Success

29

Unlimited, though such progress admittedly would have been difficult to prove in such a short time frame.

In finding the placement appropriate, the hearing officer treated the reduction of J.S.'s hours in school as evidence that the school was tailoring its approach to J.S.'s education. The court does not entirely agree. Though the change was in part an effort tailor the approach to J.S.'s needs, the court finds that the choice of tutoring was mostly a response to the lack of space in the (more appropriate) small classroom for students with intensive needs. Moreover, the provision of tutoring for only one hour two times per week--to cover both academics and behavior--was simply too little. And though the court might find such a reduction in educational time acceptable on a brief interim basis, the court has no evidence as to what actually happened after the head of school's testimony in early March 2022. The court knows only what the head of school hoped would happen.

30

This is not to say that Success Unlimited could never be an appropriate placement for J.S.  The head of school testified that the school staff would develop the school's equivalent of a behavior-improvement plan for J.S. after receiving the results of his independent educational evaluation.  Tr. (Doc. 26-1) at 17.  If the evidence showed that the school indeed implemented such a plan and was thus able to provide J.S. with significantly more hours of teaching, or that J.S. was placed in the smaller class the head of school thought best for him, the court might have found the placement appropriate. Such evidence could well be presented in a future proceeding.  But the court does not have such evidence before it now.

In sum, the record now before the court is simply too thin a reed on which to order the district to reimburse J.S.'s parents for his tuition.  The court concludes that, on this record, Success Unlimited was not an appropriate placement for J.S. from January 2022

31

to March 28, 2022.   Therefore, the court will not order reimbursement of the cost of J.S.'s tuition there for that period.[6]

                                   ***

    While the court enters this opinion today on the parents' challenge to the hearing officer's decision, it is not entering an order finally resolving the matter at this time.   The court first wants to meet with the attorneys to discuss (1) what type of order should be entered and (2) how to proceed on the school district's appeal and the parents' other claims.

    Accordingly, it is ORDERED that:

    (1) A status conference to discuss how to proceed is set for May 12, 2023, at 9:00 a.m., by videoconference.   The courtroom deputy is to arrange for such.

_____

    6. As this resolves the reimbursement issue, the court does not address whether equitable factors preclude reimbursement.

(2)   In the interim, no later than three business days before the status conference, the parties shall meet in person or by videoconference and make a good-faith effort to resolve the remaining issues in the case.

DONE, this the 3rd day of May, 2023.

/s/ Myron H. Thompson
UNITED STATES DISTRICT JUDGE

33